MARTIN TIMBER Co., INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Martin Timber Co. v. Commissioner
Docket No. 487-71.
United States Tax Court
T.C. Memo 1972-255; 1972 Tax Ct. Memo LEXIS 2; 31 T.C.M. (CCH) 1266; T.C.M. (RIA) 72255; December 27, 1972, Filed *2 F. A. Little, Jr., for the petitioner. Paul H. Waldman, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined deficiencies in petitioner's Federal income tax for 1966, 1967, and 1968 in the amounts of $13,115.88, $9,801.25, and $251.25, respectively. The only issue for decision is the fair market values, for purposes of section 631(a), [1] of 5,137,401 board feet of pine and 822,577 board feet of hardwood on January 1, 1966, and the fair market value of 2,225,098 board feet of pine on January 1, 1967. FINDINGS OF FACT Martin Timber Co., Inc. (hereinafter referred to as petitioner), is a corporation organized under the laws of the State of Louisiana. At the time its petition was filed with this Court, its principal office was in Castor, Louisiana. Petitioner filed its Federal income tax returns for the calendar years 1966 through 1968 with the district director of internal revenue, New Orleans, Louisiana. Petitioner was incorporated on January 1, 1957. Its principal business activity is the sale *3 of yellow pine and hardwood lumber produced at its sawmill in Castor, Louisiana. The timber used in the sawmill operation comes from petitioner's own property, as well as from other private timber producers and the United States Forest Service (hereinafter referred to as U.S.F.S.). During 1966, petitioner cut 5,137,401 board feet of pine and 822,577 board feet of hardwood from 36 tracts of its timberland. In 1967, it cut 2,225,098 board feet of pine from 27 tracts of its timberland. The timber cut during this period grew on small scattered tracts of land within 50 miles of petitioner's sawmill in Castor, Louisiana. The tracts were located primarily in the Red River, Natchitoches, and Bienville Parishes. Although the timber on these tracts varied to some extent, overall it was of good quality and grade and somewhat above the average in that area. There has always been a demand for timber from the Castor area of Louisiana because of its quality and accessibility to the many local sawmills. The prices paid in this area usually have been higher than the average prices paid throughout the State. During 1966 and 1967, the overall market price for timber, as well as the price in the Castor *4 area, increased by as much as 10 percent. The quality of the timber petitioner cut from its property during 1966 and 1967, in general, was similar to the quality of the timber sold in this area by the U.S.F.S. The density and volume cut per acre on these lands were also similar. U.S.F.S. sales involve selected timber growing on Government land. Prior to the sale, the U.S.F.S. selects and marks the trees in a given area. The determination of which trees are to be cut is made with the view of improving the timber stand through a more even distribution of the remaining trees. The trees selected for cutting are generally representative of the trees growing in the area. This method of cutting is used by petitioner, as well as the U.S.F.S. stOn the basis of its selections, the U.S.F.S. prepares a prospectus for each sale, stating the type of timber involved-- pine or hardwood, sawtimber or pulpwood--the number of pine sawtimber trees involved and a breakdown of their diameters at 4-1/2 feet off the ground, the total volume of each type of sawtimber in thousand board feet on the Scribner Decimal "C" scale, the volume of each type of sawtimber in each diameter group, the volume of the pulpwood *5 in cords, the total number of acres, the acres to be cut, the minimum acceptable bid, the road maintenance costs, the required slash deposits to insure the area will be cleared of debris after the cutting is completed, and whether any road construction will be required. On the basis of the prospectus, interested purchasers submit sealed bids, and the contract is awarded to the highest bidder. The purchaser must cut and remove the timber from the designated area. He is required to cut the selected trees and must pay a penalty for any marked trees that are not cut, as well as for any unmarked trees that are cut. The following charts show U.S.F.S. pine and hardwood sales from June 1965 to July 1966, and pine sales from July 1966 to July 1967: UNITED STATES FOREST SERVICE PINE TIMBER TRANSACTIONS June 1965 to June 1966
Volume
[2] *6 Cost Per
Per Acre
Thousand Date
[1] Board Feet
(Board Feet)
Board Feet
6/23/65
6,142,000
3,787
$32.70
6/29/65
4,158,000
2,416
31.88
12/ 2/65
3,597,000
2,582
42.40
2/17/66
3,426,000
3,241
46.28
3/31/66
1,495,000
1,722
44.44
4/ 7/66
257,000
3,671
42.64
5/24/66
3,281,000
1,695
55.38
5/26/66
5,670,000
4,362
62.00
UNITED STATES FOREST SERVICE HARDWOOD TIMBER TRANSACTIONS July 1, 1965, to June 30, 1966
Average
[2] Cost
Volume
Per
Per Tree
Thousand Date
[1] Board Feet
(Board Feet)
Board Feet
12/ 2/65
80,000
90
$20.00
1/25/66
575,000
201
37.11
2/17/66
90,000
79
25.01
UNITED STATES FOREST SERVICE PINE TIMBER TRANSACTIONS July 1, 1966, to June 30, 1967
Volume
[2] Cost Per
Per Acre
Thousand Date
[1] Board Feet
(Board Feet)
Board Feet
10/ 6/66
2,139,000
1,536
$45.47
11/15/66
1,829,000
1,931
45.54
12/ 8/66
3,066,000
2,923
55.32
3/ 7/67
2,581,000
1,832
56.20
4/27/67
2,232,000
3,070
61.04
5/16/67
1,200,000
2,335
57.53
5/23/67
1,226,000
2,597
57.32
6/ 6/67
2,175,000
1,944
58.65
6/13/67
229,000
836
36.66
6/22/67
826,000
2,145
54.21
6/29/67
3,006,000
1,873
56.21
During 1966 and 1967, the International Paper Company and Davis Brothers Lumber Company made frequent sales of generally comparable timber from land in the Castor area. The information concerning those sales is contained in the following charts: INTERNATIONAL PAPER COMPANY
Cost Per
Volume
Thousand Period
(Board Feet)
Board Feet
SALES OF PINE - 1966
July 1965
549,736
$36.00
August 1965
58,250
30.00
August 1965
537,000
40.21
February 1966
620,000
37.00
March 1966
300,000
42.38
April 1966
220,500
40.00
June 1966
791,000
42.53
June 1966
243,000
52.14
SALES OF HARDWOOD - 1966
August 1965
18,703
$ 8.00
March 1966
771,000
37.77
April 1966
41,865
12.00
April 1966
41,865
12.00
June 1966
95,000
34.51
June 1966
505,000
46.30
SALES OF PINE - 1967
December 1966
76,000
$40.00
January 1967
514,819
41.00
April 1967
148,926
43.00
May 1967
54,394
43.00
June 1967
174,859
44.87
*7 DAVIS BROTHERS LUMBER COMPANY
Cost Per
Volume
Thousand Period
(Board Feet)
Board Feet
SALES OF PINE - 1966
September 1965
542.028
$38.25
December 1965
1,335,011
46.00
December 1965
1,298,523
32.46
February 1966
1,005,512
46.00
April 1966
1,252,495
48.56
May 1966
1,331,486
58.00
June 1966
1,207,415
53.11
SALES OF HARDWOOD - 1966
September 1965
43,257
$15.00
December 1965
186,225
45.00
December 1965
352,362
14.57
February 1966
194,416
33.18
April 1966
297,653
35.00
May 1966
292,154
35.00
June 1966
139,189
22.00
SALES OF PINE - 1967
February 1967
1,019,964
$53.11
June 1967
793,665
55.25
The U.S.F.S., International Paper Company, and Davis Brothers Lumber Company are three of the largest timber producers in the Castor area. Information relating to sales by certain other timber owners in the area is set forth in the following charts: OTHER TIMBER SALES
Cost Per
Volume
Thousand Seller
Period
(Board Feet)
Board Feet
SALES OF PINE - 1966
Wm. Hatten, et al.
November 1965
226,700
$47.00
King Estate
January 1966
489,000
48.00
D. E. Hathaway
March 1966
163,974
51.08
SALES OF HARDWOOD - 1966
Clyde Anthony
December 1965
506,770
$27.37
J. O. Evans
January 1966
50,000
27.00
SALES OF PINE - 1967
R. F. Lewis & Son
September 1966
258,000
$50.00
Boise Cascade
December 1966
910,000
50.00 The *8 fair market values of the timber cut by petitioner in 1966 and 1967, here in controversy, as of the first day of each of those years, as reported in petitioner's income tax returns and as determined by respondent, were as follows: Respondent's
Tax Returns
Determination
Kind of
(Per Thousand
(Per Thousand Year
Timber
Board Feet)
Board Feet)
1966
Pine
$51.60
$41.00
1966
Hardwood
30.86
25.00
1967
Pine
54.00
46.00
ULTIMATE FINDINGS OF FACT As to the timber which petitioner cut in 1966, the fair market value of the pine on January 1, 1966, was $49 per thousand board feet, and the fair market value of the hardwood on that date was $27 per thousand board feet. As to the timber which petitioner cut in 1967, the fair market value of the pine on January 1, 1967, was $52 per thousand board feet. OPINION Section 631(a) [2] *10 is an elective provision which allows a taxpayer to treat the cutting of timber during a taxable year ("providing he has owned such timber * * * for a period of more than 6 months before the beginning of such year") as a sale or exchange of a capital asset. When this election is made, gain or loss is recognized by the taxpayer in an amount equal to the difference between (1) the fair market value *9 of the timber as of the first day of the taxable year in which such timber is cut, and (2) the taxpayer's adjusted basis for depletion of the timber. See section 1.631-1(d)(1), Income Tax Regs. Since petitioner reports its income on a calendar year basis, the issue in the instant case is the respective January 1 fair market values of the timber which petitioner cut in 1966 and 1967. Fair market value for purposes of section 631(a) is defined in the well-known formula, i.e., the price at which the timber would be sold in a transaction between a reasonably well-informed buyer and seller, neither being under compulsion to buy or sell. See section 1.631-1(d)(2), Income Tax Regs. A host of factors--the character, quality, quantity, and location of the timber; its accessibility to sawmills; the prices paid in actual sales of similar timber; disinterested appraisals by approved methods; etc.--must be taken into account in arriving at the hypothetical selling price. See section 1.611-3(f), Income Tax Regs.
The evidence shows quite clearly that because of its quality and accessibility to the many local sawmills, timber from the area where petitioner made its 1966 and 1967 cuttings has always been in demand. While the testimony on the point is not wholly consistent, a preponderance of the evidence supports our Finding that the timber here in question *11 was somewhat above the average for the particular area. In determining the fair market value of petitioner's timber, we have been aided by the opinions of three experts, two for respondent and one for petitioner, as well as the testimony of the individual in charge of petitioner's timber property during this period. While the testimony of the three experts has been enlightening and helpful, there are weaknesses in the analysis presented by each of them that convince us that none of their opinions should be controlling as to the determination of the value of this timber. Petitioner's expert estimated the value of only the pine and hardwood petitioner cut in 1966. As we view the evidence, he placed too great an emphasis on sales occurring several months after the January 1 valuation date without adjusting for the fact that prices were continuously rising during this period. He also based his conclusions in part on a comparison of petitioner's timber with that sold by the U.S.F.S. As part of the comparison, he decreased U.S.F.S. volumes by 15 percent because the U.S.F.S. used the Scribner Decimal "C" scale rather than the Modified Doyle scale to estimate volume. Other testimony on this *12 matter raises a serious question whether this adjustment was justified. One of respondent's experts gave estimates as to the value, as of the beginning of each of the respective years in question, of the pine and hardwood cut in 1966 and the pine cut in 1967. His valuations for each of these classifications were based on a weighted average of (1) the total cost and volume of U.S.F.S. sales in the area, (2) timber purchases made by petitioner from private individuals, (3) comparable purchases made by other companies, and (4) the allocations of the purchase price between the land and timber which petitioner made in its records with respect to timber property it purchased during this period. In arriving at the total cost and volume for each of these categories, the witness made net adjustments for the dates of sales and timber quality and quantity to all the figures except the allocations referred to in item (4) above. These adjustments were to correct differences the witness felt existed between the subject timber and the sales he had chosen as comparables in each category. In making the adjustments, he considered the time of the sale in relation to the valuation date and compared petitioner's *13 timber in terms of the volume, timber log average, and volume cut per acre with the transactions he had chosen in each category. We are not satisfied with the rather mechanical approach taken by this witness. As to the adjustments, we note that practically all of them were aimed toward producing a lower overall rate per thousand board feet. Indeed, even if this were justified, his adjustments still would be in error because they were based on incorrect volume-per-acre figures for the tracts petitioner cut during 1966 and 1967. His figures related to the total acres in each tract rather than the total acres cut in each tract. Respondent's other expert witness classified the tracts according to the total volume of timber petitioner derived from each tract during 1966 and 1967. For each of those years, he arrived at a value for each classification by considering what he thought to be comparable sales. His final conclusions for 1966 and 1967 were based on a weighted average of the volume of petitioner's timber in each classification and the price he had arrived at for it. The sales he chose as comparables for those years did not include any U.S.F.S. sales. Also, his 1966 choices did not *14 include all the pine and hardwood sales made by Davis Brothers Lumber Company or all the hardwood sales made by the International Paper Company. These exclusions raise doubts as to the reliability of the opinion of this witness. In evaluating the testimony of these three expert witnesses, two general observations should be mentioned. In arriving at his figures, each expert selected a group of sales as comparables to assist him in valuing petitioner's timber. However, no attempt was made to ascertain the circumstances in which the sales were made. The prices paid in some of these sales were either so extremely high or so extremely low that an explanation was needed. The prices suggest that the transactions were not between willing parties or that they involved timber which was not comparable to the timber we are called upon to value. A second observation is that none of these expert witnesses actually examined petitioner's timberland before the 1966 and 1967 cuttings took place. The only one who came close to the property during the crucial periods was one of respondent's experts, and he admitted that he only drove past the timber and did not actually examine it. Respondent's witnesses *15 based their conclusions about petitioner's timber on an examination of the stumps that remained on the land after these cuttings had occurred. Although one of the witnesses spent some time examining the property in the fall of 1968, neither of them conducted an in-depth study until March of 1972. We think the opinions they rendered about this timber must be given less weight than those expressed by the individual who was in charge of petitioner's timber property during 1966 and 1967. Of all the witnesses, he was the only one who was familiar with petitioner's timber, and he was the only one who had followed it through the sawmill operation after it was cut. He furnished testimony on the character and quality of the timber. He exhibited an intimate knowledge of the individual tracts. Since part of his duties during 1966 and 1967 involved studying timber the U.S.F.S. offered for sale, we think his comparisons of that timber with petitioner's must also be given great weight. We note that the fair market values of petitioner's timber for 1966 and 1967, respectively, as stated in our Ultimate Findings, approximate the values reflected in several of the comparable sales described in our *16 Findings. We refer specifically to the Wm. Hatten, King Estate, and D. E. Hathaway sales of pine in 1965 and 1966; the Clyde Anthony and J. O. Evans sales of hardwood in 1965 and 1966; and the pine sales by Boise Cascade in 1966 and by Davis Brothers in February of 1967. Although we have considered the prices paid in these sales, they have not been the sole basis of our conclusion. They merely provide further support for our Ultimate Findings. In reaching our conclusion, we have considered the record as a whole, giving due weight to all the relevant testimony, stipulations, and exhibits. While we do not attempt to state in detail the weight given to each factor, we considered the quality of petitioner's timber, the prices paid in this area for comparable timber, and the distance of the timber from petitioner's sawmill, as well as the location, nature, and relative size of the various tracts from which it was cut. We have been mindful of the market conditions as they existed during 1966 and 1967 and the effect they had on timber prices. In our consideration of comparable sales for each of these years, we have been careful to eliminate the effects of a rising market by giving due consideration *17 to sales that occurred both before and after each valuation date. We have considered the way in which petitioner managed its timberland as well as the method of selection it used in cutting its timber. We have also considered the testimony of the experts and the other witnesses. On the basis of these factors and others, and exercising our own judgment, we conclude that the fair market values per thousand board feet on January 1, 1966, were $49 for the pine and $27 for the hardwood, and that the January 1, 1967, value for the pine was $52 per thousand board feet. Other matters having been settled between the parties, Decision will be entered under Rule 50. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.↩
2. Price includes bid price for timber plus slash deposits and road construction cost.
1. Scribner Decimal "C" scale. ↩
2. Price includes bid price for timber plus slash deposits and road construction cost.↩
1. Scribner Decimal "C" scale. ↩
2. Price includes bid price for timber plus slash deposits and road construction cost.↩
1. Scribner Decimal "C" scale. ↩
2. SEC. 631. GAIN OR LOSS IN THE CASE OF TIMBER, COAL, OR DOMESTIC IRON ORE.
(a) Election to Consider Cutting as Sale or Exchange.--If the taxpayer so elects on his return for a taxable year, the cutting of timber (for sale or for use in the taxpayer's trade or business) during such year by the taxpayer who owns * * * such timber (providing he has owned such timber * * * for a period of more than 6 months before the beginning of such year) shall be considered as a sale or exchange of such timber cut during such year. If such election has been made, gain or loss to the taxpayer shall be recognized in an amount equal to the difference between the fair market value of such timber, and the adjusted basis for depletion of such timber in the hands of the taxpayer. Such fair market value shall be the fair market value as of the first day of the taxable year in which such timber is cut, and shall thereafter be considered as the cost of such cut timber to the taxpayer for all purposes for which such cost is a necessary factor. * * *